Bachmeyer vs. Mutual Reserve Fund Life Ass'n.

BACHMEYER, Respondent, vs. MUTUAL RESERVE FUND LIFE ASSOCIATION, Appellant.

*March 2 — March 16, 1894.*

*Life insurance: Suicide: Insanity: Estoppel: Evidence: Instructions to jury.*

1. Although the beneficiary under a policy of life insurance stated in the proofs of loss that the assured "died by his own hand while temporarily insane," and in an action on the policy testified that she had not learned any new facts bearing on the truth of such statement since she made it, yet if she was honestly mistaken or drew a wrong inference from the facts or the opinions of others as to the insanity of the assured, she is not precluded from showing that he was sane and did not intentionally take the poison which caused his death.

2. An instruction leaving it to the jury to say whether the plaintiff was *ill-advised* in making such statement, is criticised as misleading.

3. A letter written to the defendant by an attorney in fact of the plaintiff was not admissible on behalf of the defendant, where the material statements therein consisted of the writer's opinions, and facts within his knowledge, which might be testified to by him the same as by any other witness.

4. A preponderance of evidence being sufficient to overcome the presumption against suicide, an instruction to the jury to the effect that the facts to establish suicide must be such as point *irresistibly* to that conclusion was erroneous.

5. So, an instruction that, if the jury found the assured to have been sane, they would have to "scan the evidence very closely" and "overcome *many doubts* and a *strong* presumption of the law" before they could decide in favor of the theory of suicide, was error.

6. The charge of the court in this case is *held*, in view of the evidence, to have been an inadequate presentation of the question of the insanity of the assured, and to have contained inappropriate remarks tending to disparage and undervalue the defense made in good faith upon that ground.

7. The fact that a person committed suicide is pertinent upon the issue as to his sanity.

APPEAL from the Circuit Court for *Milwaukee* County.

This is an action upon a contract between the defendant and Ludwig Bachmeyer, whereby he insured his life in the

sum of $2,000, upon the conditions therein stated, for the use and benefit of the plaintiff, who was his wife. The case was before this court in 82 Wis. 255, where the principal facts are stated, and a judgment in favor of the respondent was reversed and a new trial awarded upon the grounds there stated. The policy of insurance contains the following stipulation: "Death of a member by his own hand, whether voluntary or involuntary, sane or insane at the time, is not a risk assumed by the association in this contract."

The evidence tends to show that the assured, at the time of his death, was fifty-one years of age, and that the plaintiff, to whom he had been married twenty-five years before, was about ten years older than he. He was a carpenter, and had worked steadily for about three years and a half in the railroad shops. Seven children had been born to the parties, all of whom died in infancy. They had adopted a little girl named Clara, when she was about two years old, who, at the time of the death of the assured, was between fifteen and sixteen years of age. He always gave his wife the money when he got his pay, and she kept charge of it. He was a nervous man, and excitable, and had had palpitation of the heart the year before he died, and sometimes took quinine for his nerves. His nervousness increased and he became irritable. The parties had trouble two or three months before he died, and it kept increasing. He wanted to marry their adopted daughter, but she refused all his advances. He compelled the plaintiff to go to an attorney, and make application for a divorce, so that he could marry the girl; and he wanted her to go and live with her son by a former husband, at Pittsville, Wis. He had previously made indecent proposals to the girl while the plaintiff was absent at church, and on her return she found that Clara had locked herself in her bedroom. "She came out of the bedroom. He was sitting in a chair, reading the paper. She told me what had occurred.

Bachmeyer vs. Mutual Reserve Fund Life Ass'n.

He didn't say a word. I sent her away then. After she had left the house we didn't speak much together. I was living there with him." The evidence of the plaintiff shows that he then required her to go to Mr. Roehr about the divorce; that the assured wanted her to go, and leave everything in his hands; that the property was bought with her money, but he did not want her to have anything; that he wanted her to get a divorce, and not allow her even the things in the house; that she "should go as she stood." The action for divorce, for some reason, was delayed. She was willing to have a divorce if he would do as she wanted about the property; and he had not yet consented, but wanted the court to decide that, and this was assented to. They did not talk much together about this time. She sent Clara away about two blocks distant, for her own protection, because she did not want her exposed to any more such attacks.

It appeared that during his entire life the assured would get greatly excited at times, and be violent, but that he would soon get over it; that he acted sometimes as if he was not as other folks. On the date of the death of the assured, in the morning, he said he didn't feel good, and asked plaintiff if she had some quinine, and she went and looked, and the box was empty, and she told him there was none; that he took his dinner basket, and went to the shop. About half past 8 he came home, saying he didn't feel well enough to work. Then said he was going down town to get himself a suit of light clothes and some tools that he needed. He was as usual that morning, nothing extra, but he felt depressed,— kind of headache or something. He asked plaintiff for money, and she gave him $10, and she next saw him about half past 2, or between 1 and 2, when he came home. He was perspiring profusely, and complained of the great heat of the day,— one of the hottest of the season. Stated he didn't want any dinner. Being asked

Bachmeyer vs. Mutual Reserve Fund Life Ass'n.

if he had drank some, said he drank a glass of beer going down, and one coming up, but it didn't taste good. Wanted to change his clothes. First took a glass, and went into the buttery, put a little rum and sugar in it, and went to the pump in the yard, and he drank it. The water wasn't good, and when he drank it he put a few drops of rum in it out of the bottle. Went to the outhouse and came in. He had brought home a coat and vest, and a little anvil costing only 25 cents, and had bought a little ginger root. He used to keep it for his stomach. And he handed the plaintiff the change, and showed her the goods. He appeared as usual, only he perspired so. She helped him take off his clothes and put on dry ones, and advised him to lie down on the bed. He did so. That was a little after 2 o'clock. She sat at the table, where she could see him plain, his whole length. He laid on his back, and very still; didn't move any. "After he laid down maybe ten minutes or so, he asked me if my son had written lately,— my son by the first marriage. I told him 'No,' and then he asked me if Clara was coming back to the house, and I told him 'No.' He clasped his hands, and said, 'Oh, I am an unhappy man,' and folded his hands. He then went to sleep, and never said another word. I didn't see any movement. I remained and worked about two hours, and he slept." He continued to sleep while plaintiff was absent a short time to the grocer's, during which a neighbor sat with him. When she returned she heard a kind of rattling noise, hard breathing, which continued, and, becoming alarmed, she called in a physician, Dr. Boorse, about 6 o'clock, who continued with him until his death, about a quarter past 12 that night.

In relation to the statement contained in the proofs as to the cause of his death, she said: "I repeated what the doctors had spoken. I did not know the cause,— temporary insanity caused by morphine. That is what was their

opinion,— that he had died from morphine poison." There was an inquest held by the coroner. The finding was that the assured came to his death by taking opium poison during a fit of temporary insanity. The plaintiff testified that she did not have any talk with either Dr. Kissling or Dr. Boorse about her husband's mental condition. That there was nothing unpleasant occurred that day at home. There was no excitement. That at the time the proofs were made and signed by her she had no personal knowledge as to the particular cause of his death, and did not know of his taking opium or morphine; did not personally know that he had taken it. That he was accustomed to the use of quinine, and kept it in the house, but never had morphine or anything of the kind in or about it, and never took it, to her knowledge. That he did not bring any quinine home that day. That in answering the question in regard to the cause of death she relied on the doctors' opinion. They said they thought it was morphine. That she had no knowledge at all as to his mental condition at the time he took morphine, if he took it; did not know anything about it. That she made the statement in regard to the remote cause of death being temporary insanity, because the doctors said it. Heard them speak. They claimed he must have been insane because he took morphine. She denied that he was insane that day, or that he was ever insane. She testified that she depended on Mr. Roehr to make the proofs, which were made about a month after her husband's death. That in swearing to them she understood that she was stating the truth at the time, and that she did not at the trial know anything more about the facts and circumstances surrounding the death of her husband than at the time the proofs were made out. Had not learned any new facts since then. It appeared from medical testimony that there is but little difference in the appearance of morphine and quinine; that only an expert would be able to tell the

difference; that morphine is dispensed in the form of pills, liquid, or powder.

Gustav Kaiser testified that the insured was in his store the 28th of June,— about three weeks prior to his death. That he did not notice anything peculiar about him. That he did not show any signs of being out of his mind. Christian Oswald testified to his acquaintance with the assured. That he used to visit witness as often as once in three or four weeks. Last saw him two weeks before he died, and did not notice anything about his condition or manner that was strange at the time. Dr. Kissling also testified to visiting the assured on the evening of his death. That the statement in the proofs of death, signed by him, that he died of morphine poisoning while temporarily insane, was from information. Could not say who informed him. Remembered that the plaintiff told him the assured had queer actions lately and was very excited; did things that he had never done before, acting as a person that was not all right in his head. That so far as the insanity was concerned the statement was based on facts she related to him. That she was very much excited at the time. Dr. Boorse testified to his treatment of the assured on the occasion in question, and that the plaintiff stated to him that he had been acting strange for some time in regard to a certain young lady who was stopping at the house. That he did not think he made any statements at all to plaintiff in relation to whether Bachmeyer was or was not temporarily insane, as the cause of his death. Drs. Hay and Seaman testified as experts in the treatment of cases of insanity, in answer to hypothetical questions, and both stated that in their opinion Bachmeyer was insane at the time of taking the poison. Drs. Boorse, Hay, and Seaman were not examined on the former trial, nor were the witnesses Kaiser and Oswald.

Julius E. Roehr acted as the attorney of the plaintiff in

making up the proofs of death, which were transmitted to the defendant September 14, 1889, together with the certified copy of the proceedings and testimony taken on the coroner's inquest. The defendant offered said letter in evidence, but upon objection the court excluded it. It states: "Mr. Bachmeyer was attended in his last moments by Drs. Kissling and Boorse, and you will find Dr. Boorse's statements in the certified copy of the proceedings. You will see by the proofs that Mr. Bachmeyer committed suicide by taking morphine. There is no doubt but what he was temporarily insane, as can be shown by abundant testimony. I became acquainted with him a few months prior to his decease, and was convinced that he was mentally unsound and had no conception of the relation of things. His ideas were confused, his language incoherent, and he had some strange illusions. At the time he took the poison he was clearly unable to measure the result of such an act. I am of the opinion, therefore, that this beneficiary is entitled to the insurance, and hope that upon examination of the proofs submitted you will allow the claim." Roehr was acting under a written power of attorney, which was put in evidence, by which he was authorized to act for the plaintiff, and in her "name, place, and stead to ask, demand, receive, collect, and receipt for all moneys which are now, or which may hereafter become, due to me from the *Mutual Reserve Fund Life Association of New York,* upon a policy of insurance, No. 66,655, upon the life of Ludwig Bachmeyer, now deceased, and to sign and execute all drafts, agreements, and all papers necessary to collect all moneys arising from said policy, giving and granting unto my said attorney full power and authority," etc.

The defendant's counsel, at the close of the proofs, moved for a verdict in its favor, but this was denied. In the general charge the court explained to the jury that the facts of insanity and of suicide are not concrete facts, but

332    SUPREME COURT OF WISCONSIN.    [87

Bachmeyer vs. Mutual Reserve Fund Life Ass'n.

conclusions or inferences of fact found from other facts, and proceeded to a statement of the evidence to the jury, and instructed the jury, among other things, that "the burden of proof was upon the plaintiff to show that she was mistaken or *ill advised* in making the statement of the cause of his death contained in the proofs;" "that whoever tries to get rid of that statement assumes the burden of showing that it was *unadvisedly* or ignorantly made, or that it was made by mistake;" "that in considering the question, and the evidence bearing upon the question, of suicide, you must first determine whether or not, in your judgment, the man was sane or insane." "I can find nothing which will warrant you in going further back into the history of this man and his family than the time when he first conceived the idea of getting rid of his wife and marrying this young girl. Whether or not that amounts to insanity, I leave to your judgment. You have heard the evidence upon the subject, and the evidence of the physicians, and you have heard the opinions of the people who were acquainted with the man during that period of his life, and from that time down to his death, as to whether he evinced any other sign of insanity; and it is for you to determine what effect is to be given to these facts." It was then stated that there was no legal impediment to their marriage if and when he procured a divorce from his wife, and also the contention that such a whim, such a determination on the part of a man of his age and history tends to prove insanity, and the opposing claim that it tends to prove moral perversity or folly, and not insanity; and the court continued: "There is a maxim abroad in the world which has acquired almost the force of law,— that in matters of courtship and marriage there is no fool like an old fool. And whether or not this man was merely a foolish old man, or whether he was a crazy old man, is a question for you to determine at the outset." "After that

we find by the undisputed evidence that he went so far as
to make some indecent advances or proposals to this young
girl; that, being accused of it by her in the presence of his
wife, he sat still and read his newspaper and said nothing,
being possibly of the opinion that the women could be re-
lied upon to do all the talking that was necessary on that
occasion." Speaking of the small purchases he had made
that day, the clothes, anvil, and ginger root, the court left
it to the jury to say whether these facts indicated an in-
tention to commit suicide, and what bearing they had upon
the question of his sanity or insanity; that "another fact
which bears rather upon the question of suicide than in-
sanity is *the fact* that he had no opportunity, that we know
of, to take any poison after he had gone and laid down in
his bedroom." "There was no declaration on his part of
purchasing such a drug [morphine]. On the .contrary, he
went away, it would seem from his own statement made
at the time, partly for the purpose of procuring quinine.
There has been some evidence tending to show that the
drug clerk might have been mistaken, and that morphine
might have been given or taken by mistake for quinine,
because of the similarity of the drugs. If the man were
sane, the mere fact that he died from the effects of opium
poisoning, it being utterly unknown where he got it, when
he took it, how he procured it, whether he took it by mistake
or designedly, would not overcome the presumption against
suicide. But if he was crazy when he took it, no matter
when, how, or where, that presumption is not in the way.
So that it is material whether or not he was in his right
mind, and, if he was in his right mind, *are there any other
facts which point irresistibly* to the conclusion of suicide?
. . . If you find that he was sane and in his right mind,
you will have to scan the evidence very closely, *and you
will have to overcome many doubts and a strong presumption
of the law*, before you can decide in favor of the theory of
suicide."

There was a verdict for the plaintiff, and from the judgment thereon the defendant appealed.

For the appellant there was a brief by *Elliott & Hickox*, and oral argument by *C. F. Hickox.*

For the respondent there was a brief by *Joshua Stark* and *J. E. Roehr*, and oral argument by *Mr. Stark.*

PINNEY, J. 1. When this case was here on a former occasion [82 Wis. 255] the judgment of the circuit court was reversed because that court, upon the proofs as they then stood, withdrew from the consideration of the jury the question whether Bachmeyer was insane or not when he took the poison that caused his death, for the reason that this fact, if it existed, had an important bearing on the question whether he "died by his own hand," within the meaning of the policy. The provision of the policy is that "death of the member by his own hand, whether voluntary or involuntary, sane or insane at the time, is not a risk assumed by the association in this contract;" and it was held, in substance, that if the assured was sane at the time, and took the drug by mistake or unintentionally, there might be a recovery. *Pierce v. Travelers' L. Ins. Co.* 34 Wis. 389; *Penfold v. Universal L. Ins. Co.* 85 N. Y. 317. Proof of his insanity would rebut any presumption that might otherwise arise against suicide, or that he took the drug by mistake or unintentionally. And it was held that the sworn statement of the plaintiff in the proofs of death that the assured "died by his own hand while *temporarily insane*" was evidence as against her to prove his insanity, even in the absence of other evidence, but that an honest and unintentional mistake on her part in this respect might be shown, and that the statement would not necessarily prevent a recovery. That the assured died in consequence of morphine poison which he had taken was not, on the last trial, a matter of real question. The important issues were: (1) Whether

the statement in the proofs as to the insanity of the assured
was the result of an honest and unintentional mistake;
(2) whether, at the time the assured took the poison in
question, he was sane or insane; (3) whether it was taken
unintentionally or by mistake.

Insanity and suicide are not primary or concrete facts,
but conclusions of fact drawn from primary facts and cir-
cumstances, so that it may well be that a party might
fairly and innocently arrive at an erroneous conclusion in
respect to such questions. In view of the evidence pro-
duced at the trial, we think it was properly left to the jury
to say whether the plaintiff was honestly and innocently
mistaken in making the statement contained in her proofs,
but not that it was "ill advised," for this, in the sense that
it was unwise, injudicious, or imprudent, would be mislead-
ing. She testified at the trial that she had not learned any
new facts bearing on the truth of the statement since the
former trial, or since she made it. Nevertheless we think
that if she made a mistake, or drew a wrong inference
from the facts or the opinions of others as to the insanity
of the assured, she ought not to be precluded from having
her case submitted to the jury under proper instructions as
to the real merits of her claim. Her claim is that she made
the statement upon the strength of what the doctors and
others told her; and on the other hand the doctors testify,
in substance, that their conclusions as to the sanity of the
assured were based upon statements made to them by the
plaintiff, taken in connection, of course, with the obvious
fact that the assured had taken morphine in sufficient
quantity to cause his death. It was held on the former
appeal that there was other testimony than the statement
in the proofs of death tending to prove the insanity of Bach-
meyer at the time, and there is now, in addition thereto,
the testimony of the attending physician, Dr. Boorse, and the
expert testimony of Dr. Hay and Dr. Seaman, to the same

Bachmeyer vs. Mutual Reserve Fund Life Ass'n.

effect; and on the part of the plaintiff the testimony of two acquaintances of the deceased, tending in some degree to show his sanity. With these exceptions the testimony is, in its general effect, in substance the same as on the former trial.

2. The objection to the letter offered in evidence, written by the plaintiff's attorney, Mr. Roehr, was properly sustained. In so far as it had any material bearing upon the case, the statements which it contained consisted of his opinions, and facts within his knowledge, which should have been testified to by him the same as by any other witness, although he was attorney *in fact* for the plaintiff when he wrote the letter to the defendant. In all other respects it was to the same effect as the proofs of death, and could have added nothing to their force or effect.

3. The evidence was clearly sufficient to require the question of the sanity of the assured, as bearing upon the question of suicide, to be submitted to the jury, as well as the question whether he took the poison unintentionally or by mistake and without any intention to terminate his life, in view of the presumption against suicide in the case of a sane person; and some evidence of a somewhat indecisive nature was given, bearing upon that question. The mere fact, however, shown in evidence, that morphine is not easily distinguished from quinine by one not an expert, affords ground for little, if any, more than conjecture merely that a drug clerk may have given the assured morphine for quinine by mistake. But, as the assured purchased ginger root that day, it is probable that he visited a drug store. The effect of these considerations was, we think, unduly increased by the court inadvertently stating in the charge that the assured " went away from his house, it would seem from his own statement made at the time, partly for the purpose of procuring quinine." The record wholly fails to show that any such evidence was given. Other errors and

omissions in the statement of facts in evidence which the court made to the jury are complained of as having a tendency, under such sanction, to improperly impress the jury; and among these, as bearing on the question of suicide, "is the fact that the assured had no opportunity, that we know of, to take any poison after he had gone and laid down in the bedroom," while the evidence shows clearly that the situation was such that if he had the poison about his person he might and could have taken it if he chose, without attracting observation.

But it is not material to particularize or dwell on minor points, in view of the conclusion at which we have arrived, that there must be a new trial for error of the court in its charge to the jury, prejudicial to the defendant, in respect to the degree or quantity of proof required to show that the assured did not take the morphine poison by mistake or accident, without intent to terminate his life. After stating that, if the assured was sane when he took it, the mere fact that he died from the effects of the poisoning would not overcome the presumption against suicide, it was left to the jury to say if he was in his right mind, and whether there were "any other facts which point *irresistibly* to the conclusion of suicide;" that if "he was sane and in his right mind, you will have to scan the evidence very closely, and you will have to overcome *many doubts and a strong presumption* of the law, before you can decide in favor of the theory of suicide." A preponderance or greater weight of evidence was sufficient to establish this issue in favor of the defendant. The instruction that the facts to establish suicide must be irresistible facts,— that is to say, facts that could not possibly be opposed or resisted,— implies that in the absence of such a showing the issue of suicide should be found for the plaintiff, and that the greater weight of evidence would not suffice to establish the contrary. Again, the presumption in such a

case against suicide is but a disputable presumption, and stands for the fact only until it is overcome by evidence. Preponderating evidence is all that is necessary to displace it. Lawson, Pres. Ev. 138, 139; *Continental Ins. Co. v. Delpeuch*, 82 Pa. St. 235. It was not correct to characterize the presumption as a *strong* one, any more than in a charge to characterize any particular fact as strong evidence of a conclusion sought to be established, for this would be an invasion of the province of the jury. *Bigelow v. Doolittle*, 36 Wis. 119; *Rindskopf v. Myers, ante*, p. 80. If it may be said that presumptions are not of uniform strength or weight, it is so, not as a matter of law, but by reason of the facts out of which they arise or with which they are met or opposed. In any such case the question is one of fact whether the evidence produced preponderates against and overcomes the presumption. The question is one of fact for the jury, and the duty of the court is fully performed when it declares the existence of the presumption and that it may be displaced or overcome by evidence in the case, the weight and effect of which is for their determination.

But a more serious objection exists to this instruction, namely, that the jury would have "to overcome many *doubts*," as well as "a strong presumption of the law," before they could decide in favor of the theory of suicide. What kind of doubts are referred to? And if only reasonable doubts, it is certainly for the jury and not for the court to say whether they exist; and if such only are intended, the effect of the instruction is to require the jury to apply to the determination of this issue in a civil action the rule as to the weight and degree of evidence applicable only in criminal cases, in addition to overcoming the legal presumption.

There was sufficient evidence to go to the jury to show that the assured committed suicide, independent of the

statement contained in the proofs of death, and these erroneous instructions require a reversal of the judgment.

4. In view of the evidence, we think it was an inadequate presentation of the question of the insanity of the assured to leave it to the jury, in substance, to say whether the fact that he had " conceived the idea of getting rid of his wife and marrying this young girl" was evidence of insanity, although it was left to the jury to say whether he evinced any other sign of insanity, and for them to determine what effect was to be given to the evidence of physicians and those acquainted with him, taken in connection with the further statements that "there is a maxim abroad in the world which has acquired almost the force of law, that in matters of *courtship* and *marriage* there is no fool like an old fool; and whether or not this man was merely a foolish old man, or whether he was a *crazy* old man, was a question for the jury to determine at the outset;" and in this connection, in reference to the indecent advances or proposals made by the assured to the girl Clara, that, " being accused of it by her, in the presence of his wife, he sat still and read his newspaper and said nothing, being possibly of the opinion that the women could be relied on to do all the talking necessary on that occasion." The evidence shows that this was, in no proper sense, a matter of courtship and marriage, but that the conduct of the assured in seeking to turn away his wife of a quarter of a century, " just as she stood," as she expressed it, without anything, himself keeping all the property, was conduct of itself which the common judgment of the world would be likely to regard as irrational. We are constrained to say that these remarks were singularly inappropriate to the subject and occasion, and ought not to have found place in a charge to a jury in relation to a serious controversy. Their tendency was to disparage and undervalue the defense, which,

so far as we have been able to see, was made in entire good faith. While the mere fact that a man commits suicide does not raise a presumption of his insanity at the time, yet that fact, in connection with other evidence, is pertinent to the issue of insanity. *Karow v. Continental Ins. Co.* 57 Wis. 56. The instructions just noticed submitted the determination of the material question of the insanity of the assured upon considerations apparently independent of the fact that he had taken the poisonous drug that had so speedily terminated his life, and in the main upon the so-called courtship and marriage aspect of the case.

It follows from these views that the judgment of the circuit court must be reversed.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded for a new trial.