# HONRATH, Respondent, v. NEW YORK LIFE INSURANCE COMPANY, Appellant.

## (275 N. W. 258)

(File No. 7943.   Opinion filed September 24, 1937)

*Bailey, Voorhees, Woods & Bottum,* of Sioux Falls, for Appellant.

*Krause & Krause* and *Ervin P. Van Buren,* all of Dell Rapids, for Respondent.

RUDOLPH, P. J.   This action was instituted by Louisa Honrath to recover on a life insurance policy issued by the defendant

to Francis Honrath, son of the plaintiff, in which policy the latter was named as a beneficiary.

The policy was issued July 31, 1933, and was in force at the time of death. Under the heading "Other Provisions," the policy among other paragraphs contains the following: "In event of self-destruction during the first two insurance years, whether the Insured be sane or insane, the insurance under this Policy shall be a sum equal to the premiums thereon which have been paid to and received by the Company and no more." A contract for double indemnity attached as a rider to the policy reads in part as follows: "This agreement is issued as a part of and attached to policy No. 12,093,608 on the life of Francis Honrath, the Insured. In consideration of the payment in advance of an additional annual premium * * * the New York Life Insurance Company agrees to pay to the beneficiary under said policy in addition to and together with the amount payable under the terms of said policy, upon the death of the Insured, Two Thousand Dollars upon receipt of due proof that the death of the Insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means and occurred within ninety days after such injury and prior to the anniversary of the Policy on which the Insured's age at nearest birthday is 65; provided, however, that such Double Indemnity shall not be payable if the Insured's death resulted, directly or indirectly, from (a) self-destruction, whether sane or insane; (b) the taking of poison or inhaling of gas, whether voluntary or otherwise; * * * The company shall have the right and opportunity to examine the body and to make an autopsy unless prohibited by law."

The insured died at his home in Hartford, S. D., on January 21, 1935. Proof of death was furnished by the plaintiff to the defendant company within the time and as required by the policy, but the insurance company refused to pay plaintiff the amount claimed. Defense to the action was made on the grounds that the insured came to his death by self-destruction during the first two insurance years and that the refusal of plaintiff to permit an autopsy to determine whether or not death was caused by strychnine poisoning constitutes a breach of the contract.

The cause was tried before a jury and a verdict was rendered

in favor of the plaintiff. From a judgment entered accordingly and an order denying motion for new trial the defendant has appealed.

No claim is made under the double indemnity rider attached to the policy. The provision that "the company shall have the right and opportunity to examine the body and to make an autopsy unless prohibited by law" is contained in the contract for double indemnity. If such rider were not attached to the policy, it is manifest that there would be no contractual right to an autopsy. There being neither in the rider nor in the principal contract any expression of intention that the provision referred to shall govern other than in the separate agreement, the trial court gave to the policy the only construction which it can reasonably bear.

Defendant contends that the evidence was insufficient to support the verdict. The evidence of the defendant all clearly pointed to the fact that the insured committed suicide while insane by taking strychnine. However, the plaintiff placed on the stand a competent and qualified physician who testified that in his opinion the insured died from a disease which he described as Jacksonian epilepsy. A review of the evidence would serve no useful purpose. Sufficient to say is that we have carefully considered the entire record and are convinced that the evidence of the doctor just above referred to was sufficient to take the case to the jury.

The evidence in this case disclosed that Francis Honrath at the time of his death was insane. The physician who examined Francis a short time prior to his death determined the form of insanity to be that of dementia præcox. According to the testimony, "Dementia præcox is a term given to describe a form of mental disease in which dementia weakens the mind. The loss of intellectual power comes on early in the course of the disease." The people for whom Francis worked shortly before his death testified that Francis was "downcast"; that "he got so he wouldn't speak to us"; that "there was something wrong with him." The plaintiff, the mother of Frances, testified: "I observed that his mind was affected. * * * He told me he felt he should do away with himself and I told the Doctors that. * * * I had been taking some precautions for sometime to keep any means of destruction of life

away from him, because he was very melancholy; he told us he didn't have anything to live for. I didn't know what could turn up. The only thing I can remember that we kept out of his way that was dangerous was the knives. We had no guns." The pastor in charge of the Catholic Church at Hartford talked to the plaintiff "about the advisability of bringing a brother home from the C. C. C. camp" to be with Francis. This brother did come home and was with Francis at the time of his death. The testimony of the physician to the effect that Francis was insane stands undisputed in this record. The record throughout establishes without question that Francis was insane, and there was no attempt on behalf of the plaintiff to in any way dispute this fact. In view of the record as above disclosed, we believe, it was error for the trial judge to instruct the jury in this case regarding the presumption against suicide.

Whether this presumption should be a matter for the jury to consider under any circumstance where there is evidence regarding the death is questionable. This court in the case of Peters v. Lohr, 24 S. D. 605, 124 N. W. 853, 855, said: "A presumption is not evidence of anything, and only relates to a rule of law as to which party shall first go forward and produce evidence sustaining a matter in issue. A presumption will serve as and in the place of evidence in favor of one party or the other until prima facie evidence has been adduced by the opposite party; but the presumption should never be placed in the scale to be weighed as evidence. The presumption, when the opposite party has produced prima facie evidence, has spent its force and served its purpose, and the party then, in whose favor the presumption operated, must meet his opponent's prima facie evidence with evidence, and not presumptions. A presumption is not evidence of a fact, but purely a conclusion."

And, as stated by Wigmore on Evidence (2d Ed.) § 2491:

"It must be kept in mind that the peculiar effect of a presumption 'of law' (that is, the real presumption) is merely to invoke a rule of law compelling the jury to reach the conclusion in the absence of evidence to the contrary from the opponent. If the opponent does offer evidence to the contrary (sufficient to satisfy the judge's requirement of some evidence), the presumption dis-

appears as a rule of law, and the case is in the jury's hands free from any rule: * * *

"It is therefore a fallacy to attribute (as do some judges) an artificial probative force to a presumption, increasing for the jury the weight of the facts, even when the opponent has come forward with some evidence to the contrary."

For a good discussion see the opinion in the case of Culpepper v. State, 4 Okl. Cr. 103, 111 P. 679, 31 L. R. A. (N.S.) 1166, 140 Am. St. Rep. 668; also Brunswick v. Standard Accident Insurance Company, 278 Mo. 154, 213 S. W. 45, 7 A. L. R. 1213. However, in this case when it stands undisputed that Francis was insane, that this insanity took the form of a dementia which rendered him despondent and melancholy to the extent that the mother expressed a fear that the boy would take his life, the presumption against suicide in our opinion no longer remained, and the case should have gone to the jury freed of any presumption. This presumption against suicide is based upon the human characteristic of love of life and fear of death in a sane person. As stated by the United States Supreme Court in the case of Connecticut Mutual Life Insurance Co. v. Akens, 150 U. S. 468, 14 S. Ct. 155, 157, 37 L. Ed. 1148, the presumption is "that a sane man would not commit suicide." The New York court in the case of Germain v. Brooklyn Life Insurance Co., 26 Hun. 604, said: "The presumption in the case of a sane man is based upon his sanity, and the fact of insanity being shown, the ground of the presumption is gone."

And in Couch, Cyclopedia of Insurance Law, § 2230, the rule is stated as follows: "Thus, although, without evidence of insanity the presumption is against suicide, no such presumption arises if the insured was insane."

In this connection see Wasey v. Travelers' Insurance Company, 126 Mich. 119, 85 N. W. 459; Mutual Benefit Life Ins. Co. v. Daviess' Ex'r, 87 Ky. 541, 9 S. W. 812, 814. In this last-cited case the court said: "The presumption to be indulged, if any, in reference to an insane man, is that he will commit unnatural acts, and it is this peculiar conduct and action that enables the ordinary observer to perceive his mental derangement."

It is uniformly held that the fact of suicide is evidence of insanity. Wigmore on Evidence (2d Ed.) § 228, 2500 and 2501;

Grand·Lodge Independent Order of Mutual Aid, of Illinois v. Wieting, 168 Ill. 408, 48 N. E. 59, 61 Am. St. Rep. 123; Karow v. Insurance Co., 57 Wis. 56, 15 N. W. 27, 46 Am. Rep. 17; Ritter v. Mutual Life Insurance Co. (C.C.) 69 F. 505; Brunswick v. Standard Accident Insurance Co., supra; Modern Woodmen of America v. Kozak, 63 Neb. 146, 88 N. W. 248; Hathaway's Adm'r v. Insurance Co., 48 Vt. 335; Bachmeyer v. M. R. F. L. Ass'n, 87 Wis. 325, 58 N. W. 399. Certainly, it would seem that, if the fact of suicide is a circumstance to be considered by the jury in determining one's insanity, it would therefore follow that once insanity is established there would be no presumption against suicide.

We fully appreciate that much we have said herein is contrary to some of the language used in the case of Bircher v. Modern Brotherhood, 25 S. D. 325, 126 N. W. 583. However, it also appears to us that the language of the court in this last-cited case is contrary to the rule announced by this court in the case of Peters v. Lohr, supra, which we have above quoted. In this case every circumstance and all of the testimony, with the exception of the testimony of Dr. Erickson, who testified that in his opinoin Francis died of Jacksonian epilepsy, pointed to the fact that Francis committed suicide while insane by taking strychnine. To tell the jury under such circumstances that there is a presumption against suicide if in fact there is no such presumption would appear to us to be extremely misleading and confusing to a jury and prejudicial to the defendant. Without question the burden to prove suicide was upon the defendant, but to tell the jury that, in addition to carrying that burden, the defendant must overcome a presumption of law which under the facts as disclosed did not exist, was in our opinion encumbering the defendant with practically an impossible burden. If the testimony of Dr. Erickson was sufficient to take this case to the jury, and we agree that it was, the case was for the jury upon all the evidence, and it was for the jury to say whether or not the defendant had met its burden of proving that Francis committed suicide. If to meet this burden the defendant relies upon circumstantial evidence, the facts and circumstances shown must be inconsistent with any other rational theory. Erickson v. Todd, 62 S. D. 280, 252 N. W. 879. But this rule does not mean that defendant should be compelled to over-

come a presumption of law which upon the admitted facts did not exist.

▮▮▮▮ Over the objection of the defendant, the court received evidence of the fact that the deceased returned to the farm where he was working on a Sunday evening in September with a bruise on his shoulder, his shirt somewhat torn at that place, and his clothes covered with mud, and also of his conduct during the remainder of the evening. In the then state of the record, and in the state of the record as a whole, it is apparent that this evidence was prejudicial to the defendant. In our opinion it was neither legally nor logically relevant.

Manifestly, this evidence was offered as proof that the deceased had dislocated a vertebra that evening, or that he had suffered some other injury at that time which later developed into Jacksonian epilepsy. Because no other circumstances are evidenced connecting the claimed displacement of a vertebra or the claimed epilepsy with the events of the Sunday evening, and because these circumstances in themselves fall so short of establishing any injury at all, it is apparent that a finding based thereon rests on conjecture and not on proof.

Prior to the time when this evidence was offered, counsel for respondent had painted a picture portraying the boy as pitching headfirst from his bicycle while going at high speed, and showing him lying in an unconscious state for some time thereafter. This picture was painted by questions and not by proof. Objections to such questions were sustained by the court, but counsel persisted at every opportunity in asking similar questions if he did not create opportunity to ask such questions. These questions were not only prejudicial, but no other conclusion can be reached but that experienced counsel intended thereby to prejudice the jury. In such a state of the record, to admit proof that on the evening in question the clothes of deceased were covered with mud, his shirt was torn, he was late in returning home, and promptly repaired to bed thereafter, did but confirm the impression theretofore improperly given that he had suffered a severe injury that evening. This prejudice was further augmented by assumptions permitted by the court in the examination and cross-examination of experts. Counsel for respondent was permitted to inject an as-

sumption of head injuries in certain of his questions to experts, and was permitted to question experts as to whether or not a blow of sufficient force could be received by pitching headfirst off from a bicycle, while going at high speed, to bring on Jacksonian epilepsy or to displace a vertebra.

The fact that this evidence was received and the assumptions were permitted over the objections of defendant undoubtedly induced a belief on the part of the jury that the evidence could properly be considered by them in determining whether the deceased had suffered a severe injury, and also in conjecturing as to the effects of that injury.

The judgment and order appealed from are reversed.

POLLEY and SMITH, JJ., concur.

ROBERTS and WARREN, JJ., dissent.