**NATIONAL LEAD CO. v. SCHUFT et al.**

No. 13883.

United States Court of Appeals
Eighth Circuit.

Aug. 12, 1949.

Rehearing Denied Sept. 6, 1949.
Writ of Certiorari Denied Nov. 7, 1949.
See 70 S.Ct. 149.

Holton Davenport, Sioux Falls, S. D. (Boyd Leedom and R. E. Driscoll, Jr., Rapid City, S. D., with him on the brief), for appellant.

Mr. Julius Skaug, Mobridge, S. D. (Mr. Pat Morrison, Mobridge, S. D., H. F. Fellows, Rapid City, S. D., and Lem Overpeck, Belle Fourche, S. D., with him on the brief), for appellees.

Before SANBORN, WOODROUGH, and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

A bentonite and humus processing plant in Belle Fourche, South Dakota, owned and operated by National Lead Company, burned and destroyed also an adjacent warehouse. The owners of the warehouse sued National Lead for damages, alleging that the fire was due to the latter's negligence. Some insurance companies, which had become subrogated to part of the warehouse-owners' rights, by having made payments under their policies, also joined in the suit. A jury returned a verdict for the plaintiffs, and National Lead has appealed.

The sole question presented is the sufficiency of the evidence to sustain the verdict. National Lead contends, as it did on its motion for a directed verdict and in its subsequent motion for judgment notwithstanding the verdict, that there is nothing to support a finding of negligence against it, and that in any event its alleged negligence is not shown to have had any relationship as a proximate cause, except by speculation and conjecture.

National Lead's plant was a wooden structure, with its main portion 51 feet in height and with three floor levels. These levels were partially filled in with "catwalks," etc., but they were not separated off or enclosed, so that the whole space was in effect a single, high, open room.

The plant had for some time been used exclusively for processing bentonite. Bentonite is an inert clay, which is dried and ground for various industrial uses, such as in oil-well drilling. Four or five days before the fire, the processing of humus was added to the plant's operations. Humus is weathered lignite coal, obtained near the surface of the earth, which is ground and packaged primarily for use as a pigment or stain. The grinding of humus produces lignite dust, which under suitable conditions can ignite or explode. The evidence showed that the humus operations gave rise to heavy clouds of lignite dust which left deposits throughout the building. Respirators, with changeable filters, had to be used by the workmen during the processing.

The bentonite processing was carried on both day and night. The newly-commenced humus processing was a part-time operation only. The bentonite processing required furnaces, with temperatures of 1800 to 2000 degrees, having an uncovered air-

opening on the side, leading directly to the fire-box and "large enough for a man to crawl in." Conveyors were used in moving the bentonite through the plant, and these had perforated gas pipes under them, with numerous individual jets of open flames, to keep the bentonite from sticking.

It was plaintiffs' theory that the fire-box openings in the furnaces and the exposed gas flames of the conveyors created a dangerous condition in relation to the inflammable humus dust, amounting to negligence on the part of National Lead, and that this negligence had been the cause of the fire. These questions were submitted to the jury.

The fire occurred at 9 o'clock in the morning. Humus had last been ground about 4 P.M. the preceding day. According to a witness, the plant at that time became filled with lignite dust, "so thick you could not see one another working," which required the witness to change filters in his respirator. There was black dust "all over the place"—in the air and on the walls, ceilings, floors, machinery, ladders, etc. During the few days that the humus operations had been carried on, lignite particles had become suspended in the cobwebs of the building. A bin on the third floor where the witness was working on the morning of the fire also contained an accumulation of it.

The witness further testified that when he came to work that morning the air still contained black dust; which he thought might have been due to the stirring-up caused by the operation of the machinery. It was sufficiently heavy so that the janitor was unable to rid the floors of it in his morning cleaning. "Sweep one room and come back and the next one would be just as bad as it was before he started." At the time the fire occurred, the witness had taken off his respirator and gone out through a window on the third floor to get a breath of fresh air. He saw no fire at that time, but about a minute later he smelled smoke from within the plant, and when he looked through the window "the whole inside was all smoke and fire." "It seemed to me to take just seconds after it took off to get all over the building."

There was a series of puffs of smoke and fire, "just like you took a big shovel full of coal and threw it on a hot fire or coals and let it blow up." The fire apparently was of such speed and intensity that another employee, with whom the witness had been working in cleaning the third-floor bin, did not have an opportunity to escape but lost his life.

There was evidence that the humus contained approximately 50 per cent of volatile matter, of which 60 to 70 per cent was inflammable. Both parties performed experiments before the jury to demonstrate how the ground particles would react to contact with flame. One expert testified that a sufficient concentration could lodge in a cobweb from floating humus dust to cause "a very fast spurt of fire." "If you have it suspended on cobwebs, or wood, or anything, and we assume somebody is walking, or something moves, and they kick dust down and it passes the flame, it will ignite and ignite other substances close to it." The existence of a safety code or set of general standards, of accepted recognition in the lignite field, was shown, condemning the pulverizing of lignite where there are open flames and suggesting a ban even on personal smoking.

On this and other evidence in the record, we can not say as a matter of law that no basis existed for finding National Lead negligent from carrying on humus-grinding operations in the conditions of the bentonite-processing plant. Whether it further could be properly found that such negligence was a proximate cause of the fire is perhaps a closer question, in that there is no direct proof of how the fire started but the evidence is wholly circumstantial.

The testimony of a witness as to the rapidity with which the fire broke out and spread inside the building with semi-explosive puffs has previously been referred to. If the jury believed this testimony, it was logical for it to infer that some form of gaseous propagation had occurred. Evidence was before it that lignite dust was capable of such propagation. National Lead argues, however, that such propagation was not entitled to be inferred in

the particular situation, in view of the testimony of the chemical experts that humus dust was inflammable only when it became heated to a temperature of 1100 degrees Fahrenheit and that it would not propagate fire from one particle to another except in a concentration of at least one-fifth of an ounce of particles per cubic foot, which constituted a "fairly dense" cloud. But another witness testified that the presence of other variables in any atmospheric concentration of lignite dust could affect that situation. And, of course, the conditions of a factory are not ordinarily those of the laboratory. Furthermore, as has been indicated, there was testimony that before the fire black dust was floating in the air, of such concentration that the sweeping efforts of a janitor were not able to keep the floor clean. We have no right to say that the jury could not credit this testimony.

National Lead further argues, that plaintiffs' theory of liability is insufficiently supported, because the evidence did not establish that the fire had its origin on the first floor, where the open flames complained of were located. No one saw the fire start. Some of the witnesses thought they first saw flames at the third-floor level. To another they seemed to appear at the second-floor level. If any volatilization initially occurred, it was not unnatural for the heated or burning gas to rise. And on the evidence, the inference that the momentarily successive puffs of fire and smoke, to which a witness testified, were due to a propagation of the varying accumulations of lignite dust and particles throughout the plant was not probatively unsupported. As one expert hypothesized the situation, "there had been some dislodging of this dust [which somewhere came in contact with a flame], each part of it took off and caused your puffs and explosions which continued to spread it over the entire building."

On these circumstances and testimony, we can not hold that the relationship of National Lead's negligence as a proximate cause was a matter of mere speculation and conjecture. Inferences made from probative facts do not consti-

tute legal speculations, if they can be said to be probabilities by the test of common judgment. Christie v. Callahan, 75 U.S. App.D.C., 133, 124 F.2d 825, 840. Nor is speculation involved merely because a choice of inferences is possible from the probative facts. Turner County, S. D. v. Miller, 8 Cir., 170 F.2d 820, 827.

But National Lead contends that these principles are not controlling in the present situation, since South Dakota law does not permit a theory of liability to be established by circumstantial evidence alone, unless the facts shown are not only consistent with such theory but are also inconsistent with any other rational theory. The Supreme Court of South Dakota has said that "This * * * should be the rule whereby the weight of circumstantial evidence is determined in a civil case as well as in a criminal case." Erickson v. Todd. 62 S.D. 280, 252 N.W. 879, 881. See also Honrath v. New York Life Ins. Co., 65 S.D. 480, 275 N.W. 258, 261, 112 A. L.R. 1272; Anderson v. Dunn, 68 S.D. 479, 4 N.W.2d 810, 812; Crilly v. Morris, 70 S.D. 584, 19 N.W.2d 836, 844; General Tire & Rubber Co. v. Hamm, 69 S.D. 72, 6 N.W.2d 442, 444: Hardware Mutual Ins. Co. of Minn. v. Jacob Heib, Inc., 8 Cir., 146 F.2d 447, 453.

We do not, however, understand this to mean that proximate cause in a negligence case resting on circumstantial evidence is ordinarily a question for the court and not the jury. Nor have we so applied the rule in the South Dakota cases that have come before us. See e. g. Turner County, S. D. v. Miller, 8 Cir., 170 F.2d 820; Minnehaha County, S. D. v. Kelley, 8 Cir., 150 F.2d 356; Jackson County, S. D. v. Dufty, 8 Cir., 147 F.2d 227. And the South Dakota Supreme Court itself has said, quoting from Finkelston v. Chicago, Milwaukee & St. P. Ry. Co., 94 Wis. 270, 68 N.W. 1005, in relation to proof of the origin of a fire: " 'Obviously it is no objection that the origin of the fire was not established by direct evidence.' 'If such an occurrence is within reason, then it was a question for the jury to say whether the fire was so caused or not.' " Meir & Lockwood Corp. v. Da-

kota Live Stock & Inv. Co., 46 S.D. 397, 193 N.W. 138, 142.

Beyond this, it is to be noted that, while National Lead argues that the possibility of gas having escaped from the pipes or jets used in connection with the conveyors, or of combustible fumes having been formed from the oil used in the bentonite furnaces, is an equally rational theory of proximate cause with that alleged by the plaintiffs, there is no evidence whatever of any such condition of escaped gas or formed oil-fumes having existed in the plant. The same is true of the suggestion that the fire may have been caused by a passing switch engine, and especially so since all the evidence in the record indicates that the fire originated inside the plant. No possible basis therefore can be claimed to exist for the contention that as a matter of law the theory of plaintiffs was not "inconsistent with any other rational theory."

■ A theory of proximate cause resting in probative circumstances does not become a matter of speculation and conjecture by a mere suggestion of other possible causes which are unsupported by any proved facts. Sears Roebuck & Co. v. Peterson, 8 Cir., 76 F.2d 243, 247; Terminal Railroad Ass'n of St. Louis v. Farris, 8 Cir., 69 F.2d 779, 785.

Affirmed.