FINKELSTON, Appellant, vs. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, Respondent.

*October 15 — November 4, 1896.*

*Railroads: Fires set from locomotive: Evidence: Court and jury: Reasonable inference.*

1. Unless the evidence, under the most favorable construction it will legitimately bear, including all reasonable inferences therefrom and assuming that it establishes all that it tends to establish, is sufficient to produce conviction in the minds of men of ordinary intelligence, to a reasonable certainty, of the existence of the ultimate fact in issue, it is the duty of the trial judge to direct a verdict for the defendant.

Finkelston vs. Chicago, Milwaukee & St. Paul R. Co.

2. The trial court is not warranted in directing a verdict in favor of one party merely because a verdict in favor of the other party would be set aside as contrary to the clear preponderance of the evidence, the inferences to be drawn from the evidence in the first instance being solely for the jury, except where, in any legitimate view of it, no reasonable inference can be drawn therefrom which will support a verdict other than one way.

3. In an action against a railroad company for the burning of an elevator or warehouse, alleged to have been caused by sparks from a locomotive, there was evidence tending to show that about an hour and a half before the fire was discovered and after it became dark sparks in unusual quantities and of unusual size, some appearing as large as hazelnuts or a thumb nail, were projected from the smokestack of a locomotive standing on a side track six or seven feet from the warehouse; that after reaching a height of from thirty to forty feet they floated northward carried by a gentle wind blowing from the south towards the warehouse and an open window in the south end of the cupola, which was located about thirty feet from the ground and twenty-five feet north of the side track; that some of the sparks passed entirely over the building and others settled against and upon it and disappeared; that the inside of the building was dry and had been thoroughly cleaned of all rubbish and loose combustible material the day before the fire; that the building was discovered to be on fire somewhere between the first and second floors, outside of the elevator shaft; and that the fire spread rapidly to all parts of the building. The fire occurred on the evening of a hot day in June. It was conceded that if the fire from the locomotive started the conflagration it must have proceeded from the smokestack to the open window in the cupola, thence through such window downward through the elevator shaft to a point below the second floor, and thence out from the open side of such shaft to the east. *Held,* that it was unreasonable to infer that such cinders, being so light as to float for a considerable distance in a gentle breeze, would retain fire for any great length of time; that if such material retained fire until it floated to the vicinity of the window in the cupola, it passed through such window and down the elevator shaft; or that, under the circumstances, if such material still retaining fire passed through the window and down the elevator shaft, it found a lodgment and smoldered for an hour and a half without manifesting itself. The court therefore properly directed a verdict for the defendant.

WINSLOW and PINNEY, JJ., dissent.

APPEAL from a judgment of the circuit court for Dane county: R. G. SIEBECKER, Circuit Judge. *Affirmed.*

Action to recover damages for the destruction by fire of plaintiff's warehouse and store building attached thereto, which occurred on the 22d day of July, 1893, alleged to have been caused by negligence of defendant's employees. The warehouse was forty feet long by thirty feet wide, located north of one of defendant's side tracks at Spring Green, Wisconsin, and nearly parallel with such track. The southwest corner was about seven feet, and the southeast corner about fourteen feet, from the center of such track. It was a wooden, frame structure, eighteen feet high to the top plate, with a gabled roof, one-third pitch, lengthwise of the building. There was a basement about eight feet deep, from which, in the northwest corner, there was an elevator shaft four and one-half by five feet, extending up to and ending in a cupola constructed wholly on the north side of the ridge of the roof. The cupola was twelve feet wide by fourteen feet long. The sides extended about three feet above the ridge of the warehouse. It was covered by a gabled roof, with ends towards the north and south. The top was about thirty-seven feet from the ground. In the south gable, towards the side track, was a window which, there was evidence tending to show, was open at the time of the fire, and was about thirty feet above and twenty-five feet north of the center of the track. The sides of the warehouse and the cupola were made of boards put on perpendicular, with battens over the cracks, and the whole painted. North of the warehouse, about three feet, was the south wall of a brick store building, the walls of which extended several feet above the plate of the warehouse. The space between the buildings was made into a covered alley connecting them together. The alley was floored at the bottom with pine boards placed about on a level with the floors of the buildings. Sixteen feet above the lower floor

was a ceiling, which also formed a second floor. About eight feet above such second floor, and six feet above the plate of the warehouse, was a covering of boards extending from the wall of the store building out a little over three feet. On the west end, the alley was closed. On the east end, it was closed up to the second floor. On the north, it was closed by the side of the store building. On the south, it was closed from the west end east to the cupola. From the southeasterly corner of the cupola east, it was left open, to admit light to windows in the upper story of the store building. On the edge of the roof of the warehouse, next to the alley, was placed a board, projecting up so as to form a gutter, the base of which was lined with tin. The openings in the warehouse were as follows: On the side toward the railway track, in the basement, there were three open windows. On the first floor, about the middle, was a door. There were also three grain spouts from bins on the second floor, closed at the lower ends, outside the building, by slides. On the east end, in the basement, were two open windows, and a way, constructed to admit of taking barrels in and out, which was covered by a slanting door. On the first floor, about the center, was a door. North of that was a window, and there was also a window opening into the alley. On the south side of the door was an opening for taking in corn, which was closed by a sliding door. In the gable, near the roof, was a window, and in the east side of the cupola, near the northeast corner, was a window. On the north side, on the lower floor, near the middle, was a door leading from the alley, and near the west end of the alley was another door from the alley. On the second floor of the alley was a door leading from such floor into the warehouse on a level with the plate. In the west end of the gable was a window. The sides of the elevator shaft, on the outside of the posts forming the framework of it, were sheathed with pine boards, except where the openings

existed hereafter mentioned. The north side was formed by the side of the warehouse; the west, by the side of the wool room; the south, by the side of the buckwheat bin; and the east side, between the level of the plates and the second floor, by the oat bin. Inside the elevator was sheathed with seven-eighths inch flooring on the north, south, and west. On the east side it was open in the basement, on the first floor, and above the plates in the second story. On a level with the top of it where it was so closed on the east, there was a passageway leading from the opening on the second floor of the alley to the center of the warehouse, and there connecting with a passageway, running at right angles, lengthwise of the building from end to end, on a level with the plate. All of the upper story, except that part occupied by the elevator shaft, was divided into bins, the top of which was on a level with the passageway. On the south side of such way were three bins of equal size, built hopper shape, in each of which there was some wheat at the time of the fire, two being nearly full. In the northeast corner was a corn bin partly filled with corn. The balance of the space on that side, up to the elevator shaft, was an oat bin, about half full of oats. The space between the elevator shaft and the wheat bin in the southwest corner was a small bin for buckwheat, which was empty. West of the elevator shaft, occupying the balance of the upper story of the building, in the northwest corner, was a wool room, nearly empty, which was closed in on all sides from every other part of the building. The lower story was, to some extent, partitioned off, but there was no partition north of the center of the floor and east of the elevator shaft. On the day before the fire the elevator was thoroughly cleaned and dusted out, from the cupola down, except the basement.

The building was in an exceedingly dry condition, owing to a long-continued period of excessively hot, dry weather.

The wind was blowing from the direction of the side track toward the building. The situation being as described, at 7:30 p. m. on the 22d day of July, 1893, one of defendant's freight trains was run in on the side track till the locomotive stood alongside of the warehouse. While it was in that position, there is evidence tending to show that it was so operated by defendant's servants that coals of fire and ashes were allowed to escape from the firebox to the ground, and sparks in considerable quantities to escape from the smokestack. About 8:15 p. m. the locomotive was backed away from the building, at which time, there is evidence tending to show, the engine was operated in such a way that the wheels slipped on the track, and that sparks were emitted from the smokestack in large and unusual quantities, and of an unusual size, some appearing, to one looking at them through the darkness, to be as large as a man's thumb, and thrown to a height of thirty to forty feet; that they were carried by a light wind toward the warehouse, some of them settling on the roof and others passing over it. There is a very little conflict in the evidence respecting the time when the freight engine backed away from the warehouse. It was not later than 8:17 p. m. The passenger train from the west was due at 9:49 p. m. On the evening in question it was late, and, according to the evidence, did not arrive earlier than 9:55 p. m. Witness J. G. Keller, while on his way to the 9:49 p. m. train, heard the alarm of fire first given. He testified that the train came from the west a few moments thereafter. There is some conflict in the evidence respecting the exact time when the fire was first discovered, but all the evidence shows that it was a short time before the arrival of the train from the west, and about the time it was due, viz. 9:49 p. m. The evidence is conflicting respecting the location of the fire when first discovered. There is considerable evidence tending to show that it was in the lower story of the warehouse; also, evidence tending

to show that it was first seen in the lower part of the alley, looking through the window in the east end, and that soon thereafter it was seen in the upper part of the building. A large amount of other testimony was given tending to show that the fire started in the lower part of the structure, that it was very small when first discovered, that very soon after the discovery the alarm was given, and that soon the whole building was enveloped in flames.

The building and contents, and the store building attached, with part of its contents, were destroyed. At the close of the evidence, on motion of counsel for defendant, the court directed a verdict in its favor, in the main upon the following grounds: (1) That the evidence is insufficient to show that the fire was caused by the defendant; (2) that the evidence is insufficient to show that defendant's engine was not in a proper state of repair at the time of the fire; (3) that the evidence was insufficient to show that the engine was improperly operated. Plaintiff's counsel then moved the court to set aside the verdict, and for a new trial, upon the grounds, among others, that the court erred in the omission and rejection of testimony, and that the verdict was contrary to the law and the evidence. The motion was overruled, and judgment was entered in favor of the defendant, from which this appeal was taken.

For the appellant there was a brief by *Olin & Butler*, and oral argument by *H. L. Butler* and *J. M. Olin*. They contended, *inter alia*, that it was a remarkable conclusion that after plaintiff had traced sparks the size of a kernel of corn or hazelnut or even larger, from the defendant's engine into the very window of the warehouse, and after he had negatived every other possible cause for the origin of the fire, he was not entitled to have the jury determine whether the engine had in fact set the fire. The conclusion is rendered none the less remarkable by the fact that an hour had passed before the fire was discovered. It is a matter of

common knowledge and observation that a spark is liable to slumber for hours before breaking into a blaze. The books are full of cases in which it has been held, upon evidence infinitely weaker than the testimony here, that the question of the cause of the fire was properly one for the jury. See cases cited in the opinion, and also *Abbot v. Gore*, 74 Wis. 509, 513; *Wheeler v. N. Y. C. & H. R. R. Co.* 67 Hun, 639; *Greenfield v. C. & N. W. R. Co.* 83 Iowa, 270; *Johnson v. C. & N. W. R. Co.* 77 id. 666; *Union P. R. Co. v. De Busk*, 12 Colo. 294, 38 Am. & Eng. R. Cas. 321; *Butcher v. V. V. & C. L. R. Co.* 22 id. 644; *Union P. R. Co. v. Keller*, 36 Neb. 189; *Woodson v. M. & St. P. R. Co.* 21 Minn. 60, 63; *Karsen v. M. & St. P. R. Co.* 29 id. 12; *White v. C., M. & St. P. R. Co.* 1 S. Dak. 326.

*George W. Bird* and *Robert M. La Follette*, attorneys, and *Burton Hanson*, of counsel, for the respondent.

Marshall, J.   If there is anything in this case to warrant the inference that the destruction of plaintiff's property was caused by fire which proceeded from defendant's locomotive, it consists of evidence tending to show that sparks in unusual quantities and of unusual size, on the occasion in question, were projected from the smokestack to the height of from twenty to forty feet, and then carried by a light wind in the direction of the warehouse, some of them settling upon the roof, and others passing over the structure, and the fire in the building that manifested itself about one hour and a half thereafter. The evidence of the escape of fire from the ashpan to the ground need not be considered, because it is conceded by plaintiff's counsel that, if the fire from the locomotive started the conflagration, it must have proceeded from the smokestack to the open window in the south side of the cupola, thence through such window and downward through the elevator shaft to a lodgment somewhere between the lower and second floor, at the point

where the building was ignited.   It cannot seriously be contended that there is evidence tending to sustain any other theory by which the fire was started, from any cause for which defendant is responsible; hence, unless such evidence, under the most favorable construction it will legitimately bear, including all reasonable inferences therefrom, assuming that it establishes all that it tends to establish (*O'Brien v. C. & N. W. R. Co.* 92 Wis. 340; *Fitts v. Cream City R. Co.* 59 Wis. 323; *Spensley v. Lancashire Ins. Co.* 54 Wis. 433), is sufficient to produce conviction in the minds of men of ordinary understanding, to a reasonable certainty (*Pelitier v. C., St. P., M. & O. R. Co.* 88 Wis. 521), of the existence of the ultimate fact in issue, i. e. that the fire which did the work started from the smokestack of the locomotive, it was not only proper for, but it was the duty of, the trial judge to direct a verdict for defendant.

This court rigidly maintains, inviolably, the right of trial by jury, rejecting the rule that obtains in some jurisdictions, that if the evidence is such that a verdict in favor of one party would be set aside as contrary to the clear preponderance thereof, the court is warranted in directing the proper verdict, and upholds, as the law, that inferences from the evidence in the first instance should be drawn solely by the jury, except where, in any legitimate view of it, no reasonable inference can be drawn therefrom which will support a verdict other than one way.   Then, the motion for a nonsuit or the direction of a verdict requires that disposition of the case, as a matter of right, which implies a judicial duty to grant it.   Such disposition by no means trenches on the province of the jury, but is the exercise of a judicial function, essential to the due administration of justice.

It follows, from the preceding statement of legal principles governing this case, that the question here presented is largely, if not wholly, one of law, arising from facts and circumstances which are either conclusively established by

the evidence or which we must assume to be established under the rules indicated. With that view, we proceed to restate briefly such facts.

We have a combination of the following: It was dark. Sparks in unusual quantities and of unusual size, some appearing to one looking at them through the darkness to be as large as a hazelnut or a thumb nail, were projected from the smokestack of the locomotive, standing on the side track six or eight feet from the warehouse. After reaching a height of from thirty to forty feet, they floated northerly, carried by a gentle wind, blowing from a southerly direction, toward the warehouse and the open window in the south end of the cupola, which was located about thirty feet from the ground and twenty-five feet north of the side track. Some of the sparks passed entirely over the building, and others settled against and upon it and disappeared. The inside of the building was dry. There was no way for a spark to reach the lower part of the building, between the lower and upper floors, after passing in at the window in the cupola, except by passing down the elevator shaft to a point below the bottom of the second floor, and thence out from the open side of such shaft to the east. The building, from the cupola down to and including the space between the lower and second floors, had been, during the day previous, cleaned of all rubbish, dust, cobwebs, and other loose combustible material. The structure was discovered to be on fire somewhere between the first and second floors, about one hour and a half after the sparks were emitted from the smokestack, and fire was also seen in the cupola about the same time, or soon after. It rapidly spread to all parts of the building, and consumed it and the one adjoining. Just where the fire first started does not definitely appear, but, looking at the evidence most favorably for plaintiff, it was somewhere in the lower story, as indicated, outside of the elevator shaft.

Now, in view of the preceding, can a reasonable inference be drawn that a spark which escaped from the smokestack set the fire? Can the path of the fire, by reasonable inference from the facts established, be traced from such smokestack, starting at about 8:15 p. m., through the period of time to about 9:45 p. m., to the point where the building ignited, so as to thereby establish the main facts in issue? That was a question for the court. If such an occurrence is within reason, then it was a question for the jury to say whether the fire was so caused or not. Obviously, it is no objection that the origin of the fire was not established by direct evidence; but there must be some limit beyond which the main fact cannot be found from inference, else parties circumstanced like the defendant was may be held liable for all fires, occurring in the vicinity of their tracks, that can, by any possibility, be attributed to their conduct, unless they are able to prove that the fires were not so caused. Such a rule would subject railroad companies to such penalties as to seriously and unjustly cripple a business essential to the public welfare. The origin of a fire under such circumstances must be established so as to produce conviction, to a reasonable certainty, on an unprejudiced mind, the same as any other fact; and, until there is evidence to so establish it, the defendant is not called upon to prove that the fire was not caused as alleged. *Flanaghan v. C., M. & St. P. R. Co.* (Minn.), 67 N. W. Rep. 794; *Stratton v. U. P. R. Co.* (Colo. App.), 42 Pac. Rep. 602; *Denver, T. & G. R. Co. v. De Graff*, 2 Colo. App. 42; *Denver & R. G. R. Co. v. Morton*, 3 Colo. App. 155; *Sheldon v. H. R. R. Co.* 29 Barb. 226.

In the light of the preceding, we will review briefly the principal cases cited by appellant's counsel to show that, according to precedents, this case should have been submitted to the jury.

In *Gibbons v. W. V. R. Co.* 58 Wis. 335, the fire was dis-

covered three quarters of an hour after the train had passed.
A strong wind was blowing towards the point where the
fire started.    The weather was, and had been for some
time, very dry.    There were old, rotten hemlock ties near
the track, which were burned.    The fire burned between
such ties and plaintiff's property, spreading from such prop-
erty to the ·ties, or the reverse.    This appears from the
printed case on appeal.    The question whether there was
sufficient evidence to go to the jury was raised, but the
cause was decided on another point.

In *Tribette v. I. C. R. Co.* 71 Miss. 212, the fire was dis-
covered in some cotton bales less than an hour after the
locomotive passed, which was seen to emit smoke that was
blown against the bales.    There had been a long drought.
Odor of burning cotton was noticed ten or fifteen minutes
before the fire was discovered.    When the fire finally mani-
fested itself, holes in the cotton bales on the side towards
the railway track indicated that it had been slowly eating
its way into them for a considerable length of time.    Under
these circumstances, held, that the evidence warranted the
inference that the fire caught from a spark emitted from
the locomotive.

In *Ward v. M. & St. P. R. Co.* 29 Wis. 144, the statement
of the case in the published reports is to the effect that
about two hours elapsed between the passage of the train
and the discovery of the fire, but the element of time did
not enter into the questions discussed before the court, and
decided.    That explains why such statement is far from
being accurate.    An examination of the printed case and
briefs used on the argument here, shows that there was an
abundance of evidence tending to prove that the fire was
discovered in less than an hour after the train passed, and
there were circumstances, such as direction of the wind,
emission of sparks, dryness of the building, and others, lead-

ing easily to the inference that fire from the locomotive did the mischief.

In *Grand Trunk R. Co. v. Richardson*, 91 U. S. 454, the fire was discovered in one half to three quarters of an hour after the train passed. A strong wind was blowing. It was very dry. The fire started in the roof of a covered railroad bridge, through which the train passed, from which it was communicated to plaintiff's property, which was situated but a few feet from such bridge. Held by the trial court, that the circumstances warranted the inference that the fire was started by fire from the locomotive. The question does not appear to have been raised on the appeal.

In *Cole v. L. S. & M. S. R. Co.* 105 Mich. 549, the element of time was not involved. Distance of property destroyed from right of way was the turning point. The fire was set on such right of way by a section boss, where there was dry grass and pieces of decayed wood. There was a very high wind, blowing directly towards plaintiff's building, situated 300 feet away, which was filled with hay and had the windows open. Held, that the question of the origin of the fire was for the jury.

In *Hagan v. C., D. & C. G. T. J. R. Co.* 86 Mich. 615, there was a strong wind, blowing from the track towards the property destroyed. It was very dry. As the engine passed plaintiff's building, the fireman was poking the fire. Smoke of a bluish green color, streaked with red, was seen to roll over the building, and in a few minutes the roof was on fire on the slope toward the railway track. Held that, under the circumstances, the jury were justified in inferring that the fire was caused by sparks from the locomotive.

In *Beggs v. C., W. & M. R. Co.* 75 Wis. 444, the facts were that it was a very dry time. A strong wind was blowing from defendant's track towards the property destroyed. The fire was seen soon after the train passed. It started in some

dry grass on the right of way, near which, on the track, live coals had been deposited. From the starting point it was traced by a streak of burnt grass directly to the property destroyed. Held, that the evidence was sufficient to sustain a verdict for plaintiff.

We might go on, and analyze each of the numerous cases to which our attention has been called by appellant's counsel, and many more of the same character; but it would only result in the further demonstrating, what the preceding clearly shows, that they fail utterly to fit this case. In each of the foregoing citations it will be observed that there was an unbroken chain of circumstances, starting with the escape of fire from the locomotive, and extending to the resulting fire complained of. Each fact, from start to finish, is such that, by reasonable inference, it is connected with the next in line,— all consistent with the rule that the plaintiff must not only prove that the fire which caused the injury may have proceeded from defendant's locomotive, but by reasonable affirmative evidence, to a reasonable certainty, that it did so originate. *White v. C., M. & St. P. R. Co.* 9 L. R. A. 824, 1 S. Dak. 326. Here the chain of circumstances is broken where the sparks disappeared in the direction of the warehouse. It is unreasonable to infer that cinders projected from the smokestack, so light as to float for a considerable distance in a gentle breeze, would retain fire any great length of time. It is unreasonable to infer that, if such material retained fire till it floated to the vicinity of the window in the cupola, it passed through such window, and down the elevator shaft. The night being hot and sultry, after a very hot day, reason teaches that the current of air in the elevator shaft must have been upward and outward. It is unreasonable, under the circumstances, to infer that if such material, still retaining fire, passed through the window, and down the elevator shaft, it found a lodgment, and smoldered for an hour and a half without manifesting

itself. The time is too long. Especially is this so in view of the fact that the structure had just been thoroughly cleaned of dust, cobwebs, and other loose combustible matter. In short, from the time the sparks disappeared in the direction of the warehouse, all the circumstances rebut, instead of corroborate, the theory that they had any connection with the fire that was started in the building an hour and a half thereafter. Candor compels us to say that reason and common experience in life, taking into consideration the operation of natural laws, must force this conclusion upon the ordinary understanding. All beyond the disappearance of the sparks is, at best, mere supposition and conjecture respecting what may possibly have occurred, instead of reasonable inference respecting what did occur. The element of time, without proof of facilities for lodgment of sparks in some substance liable to keep them alive, is sufficient of itself to break the chain of circumstances essential to reach from the alleged cause to the alleged fact. In *Sheldon v. H. R. R. Co.* 29 Barb. 226, the time between the alleged escape of fire from the locomotive and the discovery of the fire complained of was one hour and seventeen minutes. It was alleged that the fire started by a spark passing through the open window of the mill, situated sixty-seven feet from the railway track, that it lodged in some combustible material on the mill floor. The track master was in the vicinity twenty-five minutes after the train passed, where he would have observed a fire in the building if any had existed. The court held that, under the circumstances, even twenty-five minutes was an unreasonable length of time, because, if a live spark lodged in combustible material on the mill floor so as to start a fire, it would manifest itself before the expiration of twenty-five minutes. With this view, among others, the court sustained the nonsuit. Here, without any proof of the existence of material in which the fire may have smoldered for a time before breaking out, the sug-

gestion is that a spark passed in at the window in the cupola, thirty feet above the ground, took a devious course downward, lodged somewhere in the lower part of the building, and there remained for an hour and a half before manifesting itself. After a thorough search for and examination of precedents, we may safely venture the assertion that no satisfactory authority can be found for carrying the inference of the existence of facts unseen from those seen so far as would be required to send this case to a jury. In the words of Mr. Justice ORTON, in *Gibbons v. W. V. R. Co.* 58 Wis. 335, "mere possibility can never establish a probability of a fact requisite to be proved, in order to make a railroad company or any party liable in any action whatever, and the proposition is no sounder in logic than in law." But, without further discussion, we must hold that the nonsuit was properly granted. To decide otherwise would be to say that verdicts may rest on mere possibility, speculation, and conjecture. Where there is no legitimate basis for a verdict, courts certainly must be permitted to draw the line, else our system of jurisprudence cannot be maintained consistent with well-defined rules of justice and right.

*By the Court.*— The judgment is affirmed.

WINSLOW and PINNEY, JJ., dissent.