Statement of the Case.
MONROE, J.
Plaintiff and certain fire insurance companies, as his subrogees, obtained judgment against defendant for $4,-309.07, representing loss and damage sustained by reason of a fire which is attributed to a passing locomotive belonging to defendant, and which, it is alleged, emitted cinders, sparks, and fire, whereby plaintiff’s warehouse, with its contents, were ignited and destroyed, and certain other damage was inflicted. Defendant prosecutes the appeal, and denies that there were any defects in the locomotive or any lack of care in its handling, and specially denies that the fire of which plaintiff complains was caused by anything emitted therefrom.. It also alleges that plaintiff’s property was fully insured, and that he has been indemnified for its loss; but that defense has not been urged in this court:
Defendant’s road extends eastward from Lake Charles 14 miles to, or a little past, a station called Goss Spur, and then makes a sharp turn to the north or northeast towards Alexandria, thus forming two sides of an obtuse-angled triangle. Plaintiff’s residence is situated 250 or 300 yards to the northward of the side which leads to Lake Charles, and, say, 2% miles to the westward of the side which leads to Alexandria. His warehouse was located at Goss Spur, southeastward from his residence, on the edge of defendant’s right of way, and, say, 40 feet to the northward of its main track. It was between 60 and 70 feet long by 30 or 40 felt wide, with walls or sides consisting of 1x12 inch planks, standing upright; the cracks between them being covered with battens or narrow strips. The battens were, for the most part, in their places, and, though it is said that some of them had come off, it does not appear that any considerable crack was thereby exposed. There was a door in each end of the building and one in the side next to the railroad, all of them provided with rollers instead of hinges, and there was a crack about 3 inches wide, running up and down alongside of the door near the railroad. The roof of the building was of galvanized iron, and was perfectly sound. On the inside there was a wooden floor, extending the length of the building on the south side, and probably, some flooring, also, extending along the north side, and between them there was what may be called a dirt road, whereby wagons entering the door at one end were enabled to pass out through the door at the other end. Neither of the doors was fastened in any way, day or night, and neither plaintiff nor any one else is shown to have been inside of the building upon either the day of the fire or the day preceding; in fact, plaintiff and his son-in-law testify that they *83 had not been in the building within that time. There were, however, some holes in the side, or sides, of the building near the ground, through which small animals could gain access to the rice or other edible that might be stored within, and from the evidence introduced on behalf of plaintiff it appears that boys were in the habit of setting traps about the holes in order to catch rabbits. The warehouse was burned in the afternoon of March 25, 1910, immediately after one of defendant’s passenger trains had passed on its way to Lake Charles, and it then contained 1,256 sacks of rice, which, with some sacks of fertilizer, and other things, were destroyed with the building. Plaintiff was paid $3,981.72 by the insurance companies, and is interested in this suit only to the extent of the difference between that amount and the $4,309.07, for which he obtained judgment in the district court; the insurance companies, as subrogees, having taken his place with respect to the balance of the claim. The account which he gave of the fire, when first asked to do so by his counsel, was as follows:
“Well, I was about a quarter of a mile east of the warehouse, fixing a fence, and I saw the train coining, and it passed. There was so much smoke that I could hardly see the train. It blew the smoke right in my face. Of course, I did not pay much attention to the train; just went on with my work. I looked up, and the train was at the other side of the warehouse. I seen smoke coming over the top of the warehouse. I supposed it was that train. It looked like, though, that the warehouse was afire; but I doubted it right there, because I did not think that it was possible that it was the warehouse, and I went on working. When I looked again, the train went around the curve, and I saw there was smoke coming from the warehouse. Sure enough, it was, and I just dropped everything and run up there, and by the time I got up there it was-coming out of the doors, sides, and everywhere. I tried to get my wagon out, but the tongue run against the building, and I couldn’t get it out, and by that time it was so hot that I couldn’t get in no more, and I had to let it go. I thought I could get some rice out, but I couldn’t, and my son-in-law he said he went up and tried it, and had to give it up; so there was nothing to do but back off and let it go.”
In his direct examination plaintiff was asked:
“Can you state to the court whether, on the afternoon of this fire, this particular engine that passed your barn or warehouse was coaled or stoked up before reaching it?”
To which he replied:
“Of course, I could not see the man that was doing it, but I saw the black smoke .coming up, and I would naturally suppose that he was punching up the fire; could see it throwing 'out sparks and cinders.”
On his cross-examination he testified, in part, as follows:
“Q. Do you know the number of that engine that pulled that train that day? A. No, sir; only what you say. Q. Mr. Dudley, when did you ever see sparks emitted from the smokestack or from this train engine No. 1 that pulled a passenger train by your station on that afternoon that you think set fire to your warehouse; when and where? A. Well, I think March 15th was one. Set fire right in my yard, right by my stable. Q. Now, do you know that this was the same engine? A. -No, sir. * * * Q. Had you seen any sparks emitted from the engine at Bon Air curve, (or) when they were passing your warehouse? A. I couldn’t say as to that engine. Q. Did you see any sparks emitted from the engine that pulled that train that day? A. Well, you couldn’t see a spark in the daytime, but you could see .cinders, after it had hit the ground; see whether fire was there. Q. Fire, where? A. Where the cinders hit the ground. Q. You did see the fire? A. Yes, sir. Q. On what day? A. The day the warehouse was burned. Q. What was the size of those sparks? A. Size of buckshot; something like that. Q. You saw them, where? A, Right along my fence there, where I was at work — right along the railroad right of way.”
It was shown that the train was moving at the rate of 30 or 35 miles an hour; that it did not stop at Goss Spur; that by the time it had reached a point about three-fourths of a mile or a mile, beyond the warehouse a heavy black smoke was pouring out of that building; and that by the time plaintiff and his son-in-law could get there, running, the one from a point a quarter of a mile away, and the other from a point 250 or 300 yards away, the fire had made such headway that .they were unable to save anything in the warehouse, not even a wagon, *85 which stood there on wheels. In view of those circumstances, and 'of the fact that the fire is said to have originated when the locomotive passed the warehouse, counsel for defendant interrogated plaintiff and elicited answers as follows:
“Q. Now, you broke and ran to the warehouse as soon as you discovered that the smoke was coming out of the warehouse? A. Yes, sir. Q. Well, when you discovered that, did you see any flame with the smoke? A. No, sir; could just see smoke coming out of it. * * * Q. Couldn’t tell whether it came from the ends, or the sides, or the bottom? A. No; I was a quarter of a mile away. " When I got there, I discovered a pretty hot fire. Q. Did you see the blaze? A. Yes, sir. Q. How long did it take you to run down there, about how long; you know how long it takes you to run a quarter of a mile? A. No; I never run it only that time. It seemed about an hour and a half to me. Q. It took you an hour and a half to get down that quarter of a mile? A. No; it seemed that way. I was out of wind, and it looked as if I couldn’t get there fast enough to suit me. Q. How far was the train away from the warehouse, west, when you first discovered the smoke coming out there? A. It was close to a mile, I should think. Q. Now, Mr. Dudley, if the fire was caused by a spark from that locomotive, you think it was drifted or whirled through one of those cracks in the warehouse, and developed into a raging torrent in the time the train would run from the point opposite the warehouse nearly a mile? A. Yes, sir. * * * Q. Now, then, do you think that a spark the size of a buckshot, or any other size that escapes from the locomotive that passed your house on that evening could have been whirled in|to this warehouse through some crack on a sack (ed) commodity, like rice or fertilizer, and fanned itself into a raging fire in a minute and a half? A. Well, I have seen it throw out blazing fire, not a spark. * * * Q. That particular engine? A. No; not that particular engine. * * * Q. Now, assuming that this train was going 25 miles an hour, it would travel. * * * Do you think that that spark could have been emitted from the passing engine, whirled in through the crack into this warehouse, lit upon a sack of rough rice or fertilizer, or upon the wagon, and fanned itself into a raging torrent in a minute and a half? A. I don’t think it was any spark; I think it was a blaze of fire, which I saw several times set fire to my grass — light on the ground and stdrt burning.”
Mr. Chapman, plaintiff’s son-in-law, was resting in a hammock on the front gallery of their residence, when his wife called his attention to the smoke issuing fr'om the warehouse, and he, too, immediately ran to the scene, reaching there before the plaintiff did, and hence within a minute, or minute and a half, or at most two minutes, after the train had passed, and he gives the following, with other, testimony:
“I opened up the door on the west end, and I knew I couldn’t drag out any rice, so I went to looking around; and Mr. Dudley was coming up along the fence, running up there. By the time he got up there, why, he went on the other end and tried to get his wagon out, and couldn’t get nothing out; so there wasn’t nothing to do but to let it go. * * * Q. As I understand this barn, there was an opening in part of the floor. In other words, part of the floor had not been laid? A. Yes, sir; the roadway through it. Q. Did the air pass under there in any way? A. Yes, sir; there was places around there where rabbits and such as that had been crawling under there. There were holes under the sides of the warehouse. Boys had traps set there.”
There were several witnesses called by plaintiff who testified to having seen the smoke of the locomotive, one from a distance of 3 y2 miles, another from a distance of 1% miles, etc.; but no one but plaintiff professes to have seen any cinders, live or dead, so that his theories of sparks, cinders, and blaze from the locomotive, as the cause of the burning of the warehouse, are but theories, unsupported by any positive testimony whatever. From defendant’s witnesses it appears that the locomotive in question had come out of the repair shop about the 1st of February preceding the 25th of March on which the warehouse was burned, after a thorough overhauling, including the installation of a new, standard gauge spark arrester, which was shown to be in perfect condition after the fire, to have meshes (2y2 to the inch) as small as can be reasonably used; that the train was running on schedule time, which was 30 miles an hour, and passed the warehouse without stopping; that when it reached a point about 3,000 feet to the westward, the engineer, going round a curve, saw the smoke issuing from the warehouse; that the train was a light one, the engine was *87 “hooked Tip short,” and the fireman had stoked the fire about a mile before reaching the warehouse; and that there was but little exhaust and no throwing out of sparks or cinders.
Opinion.
It will be observed that the case of the plaintiff rests entirely upon the theory, or theories, .propounded by Mr. Dudley, .by whom the suit was first brought in his own name and for his own account, and who was later joined by his subrogees, the insurance companies. His ideas, when first placed upon the stand and asked to give an account of the fire, were apparently not altogether definite concerning the relation. of cause and effect, and he accused defendant’s locomotive of nothing worse than the emission of smoke. It is true that he says- that there was a great deal of it, so much that he “could hardly see the train.” But that was immaterial, as he was not then interested in the train; in fact, he says:
“Of course, I did not pay much attention to the train; just went on with my work.”
Later in his examination he states quite positively that he saw sparks and cinders. Still later he says that he saw no sparks, but saw live cinders on the ground. And, finally, without pretending to have witnessed any such phenomenon, he abandons the spark and cinder theory and ascribes the ignition of the warehouse to a “blaze of fire.” If, however, the locomotive, in passing the warehouse at the rate of 30 miles an hour, had projected over the 40 feet which separated them, a blaze of fire so consuming that in the one or two seconds required for the passage it was capable, by penetrating the cracks in the building, of igniting the entire contents of the warehouse, without affecting the exterior (for both Mr. Dudley and Mr. Chapman say that the fire was confined to the inside), it appears to us that he (Mr. Dudley) must needs have seen it, and, as he did not see it, we are unable to accept his theory of its existence. We are, however, inclined to agree with him that the locomotive could not have started such a fire in such a short time, and under such circumstances, with anything less than such a blaze, and doubt whether it could have been done with it, since rough rice and commercial fertilizer, sewed up in sacks of jute bagging, and the sacks piled in great masses, are not shown to generate gases, or to be so inflammable that their ignition has the effect of an explosion. The case against the locomotive rests mainly, as it appears to us, upon the circumstances that the breaking out of the fire followed its passage in front of the warehouse; but there is a wide difference between post hoc and propter hoc, and the burden was on the plaintiff to show, either by direct evidence, or by such circumstantial evidence as would furnish a basis for reasonably necessary inference, not only that the fire followed the passage of the locomotive, but that it was the consequence of some negligent act of commission or omission on the .part of the defendant in that connection. It may be asked what might or could have started the fire, if it was not the locomotive; and, whilst the theory is worth no more than those propounded by plaintiff, one might answer that the facts that the stored grain attracted rabbits “and the like,” that the rabbits attracted boys with traps, and that the boys and the rabbits and the traps and the warehouse appear to' have been left to themselves, suggest many possibilities. It is, however, sufficient, for present purposes, to say that plaintiff has failed to make out his case with anything like reasonable certainty.
The judgment appealed from is accordingly reversed; and it is now ordered that there be judgment for defendant, rejecting the demands of the plaintiff and dismissing this suit at his cost in both courts.