BEACH *v.* MICHIGAN CENTRAL RAILROAD CO.

1. RAILROADS—FIRES—NEGLIGENCE.

Where plaintiff claimed that a fire was started in his planing mill, located about 80 feet from the defendant company's railroad tracks, by sparks emitted from defendant's engine, that entered an open window during the night, but no one saw the locomotive give out any sparks, and there was no evidence that a strong wind was blowing in the direction of the mill from that of the tracks, *held,* that the cause of the destruction of plaintiff's property was conjectural and the case was properly determined by the court as a question of law.

2. SAME—PRESUMPTIONS—PROXIMATE CAUSE.

The burden, under section 6295, 2 Comp. Laws (2 Comp. Laws 1915, § 8305), remained with plaintiff to establish the origin of the fire either by direct testimony or by circumstances which reasonably lead an unprejudiced mind to conclude that it was set by a locomotive of defendant, and the fact could not be inferred merely because it might have been started in that way.

Error to Tuscola; Beach, J., presiding. Submitted January 18, 1916. (Docket No. 68.) Decided March 30, 1916.

Case by C. Ray Beach against the Michigan Central Railroad Company for negligent operation of its locomotive and the setting of a fire. Judgment for defendant on a verdict directed by the court. Plaintiff brings error. Affirmed.

*Chapman, McNamara & Matthews,* for appellant.

*J. C. Hewitt* and *George M. Humphrey* (*Humphrey, Grant & Humphrey,* of counsel), for appellee.

MOORE, J. Plaintiff was the owner of a building used as a planing mill and for the manufacture of farming implements, located 82 feet east from the east rail of the Michigan Central Railroad Company's track in the village of Millington. This building was destroyed by fire in the nighttime of July 9, 1913. The building consisted of a two-story part known as the planing mill, with a small lean-to on the south side, and to the north of the two-story part was the engine room and woodworking shop, which was one story high. These buildings were somewhat out of repair and there was considerable rubbish on the premises. At the time of the fire the buildings and machinery were not in general use, and the plaintiff was not giving them regular attention at that time of the year. For two or three days at a time he did not go near the buildings. None of the machinery was being used, and Mr. Beach was not there at all on the 8th of July, the day before the fire. It is claimed that on the night of July 9th there was no fire in the elevator, and there were no chimneys or smokestacks in the vicinity around the mill from which sparks of fire could have been blown. Some time during the night of July 9th

a train went south on defendant's tracks. It is the theory of the plaintiff that sparks from the locomotive entered an open window in the upper story of the building and thus originated the fire.

After the testimony offered upon the part of the plaintiff was concluded the trial judge was of the opinion the origin of the fire was conjectural, and directed a verdict for the defendant. The case is brought here by writ of error, and the sole question is, Was there a case which should have been submitted to the jury? The appellant insists there was a case for the jury, and in support of this contention cites many cases, including *Clark* v. *Railway Co.*, 149 Mich. 400 (112 N. W. 1121, 12 Am. & Eng. Ann. Cas. 559); *Union Ice Co.* v. *Railway Co.*, 178 Mich. 346 (144 N. W. 1033).

The position of counsel is stated in the reply brief as follows:

"As said by Jones on Evidence, circumstances surrounding an event may be as convincing as direct proof. Footprints on fresh snow show that some live thing had been there. The shape of footprints shows at once whether it was a bird, a beast, or a man. These convictions come on account of the common knowledge possessed in the minds of jurors. And to give the jury an opportunity to use these facts it is not necessary to establish by direct proof that birds make tracks in the snow.

"Now, it being conceded that jurors have common knowledge that railroad engines of this character will emit sparks and set fires, and even being conceded by defendants in their oral argument that this fact is so well established that judges take judicial knowledge of that fact, we think, under these conditions, the proof that this particular engine on that night emitted sparks would be as unnecessary as to prove that birds make tracks in the snow, And, as we said in our oral argument, there is a marked distinction between the reported cases where negligence must be proven as well as the origin of the fire and cases where only origin is required. Such proof establishes negligence which

is not required for us to establish in making our *prima facie* case on account of the statute. Further going to show that this engine would be likely to emit more sparks at this particular place in the road we have the direct proof that there was an upgrade directly opposite the building burned, and that this particular train made a big noise and a lot of puffing and had a heavy exhaust, showing that the engine when it passed the building on this grade was working steam.

"It is conceded by all courts that circumstantial evidence is sufficient in such a case, and in establishing that our case is worthy the consideration of a jury we are not required to prove by a preponderance of the evidence the elements necessary to be established. In fact, we believe the law to be that in such a case the evidence should go to the jury unless there is some known physical law which, when applied to the plaintiff's evidence and the reasonable inference which can be drawn from it, shows that the plaintiff's theory is impossible."

Counsel for each side have cited a large array of authorities in support of their respective claims, but the question of law involved is not new in this State. The statute applicable to cases of this sort is section 6295, 2 Comp. Laws (2 Comp. Laws 1915, § 8305). By its terms the railroad is made "liable for all loss or damage to property by fire originating from such railroad," etc.

In *Fisk* v. *Railroad Co.*, 114 Mich. 248 (72 N. W. 205), it was said:

"The statute does not change the common-law liability for setting fires. It simply shifts the burden of proof upon the defendant to show that such fires were not negligently set."

The statute does not relieve the plaintiff of the burden of establishing the origin of the fire. *Osborne* v. *Railway Co.*, 111 Mich. 15 (69 N. W. 86).

In the case of *Clark* v. *Railway Co.*, 149 Mich. 400 (112 N. W. 1121, 12 Am. & Eng. Ann. Cas. 559), Justice OSTRANDER, speaking for the court, said:

"The fact that the fire was set as alleged must be proved, not necessarily by the testimony of an eye-witness, but by evidence which reasonably leads an inquiring and unbiased mind to the conclusion that a cinder from the particular engine caused the fire. The evidence is not sufficient if it establishes no more than that the fire might so have been set."

He quoted with approval from *Finkelston* v. *Railway Co.*, 94 Wis. 270 (68 N. W. 1005), as follows:

"The origin of a fire under such circumstances must be established so as to produce conviction to a reasonable certainty on an unprejudiced mind, the same as any other fact; and until there is evidence to so establish it the defendant is not called upon to prove that the fire was not caused as alleged."

In *Hewitt* v. *Railroad Co.*, 171 Mich., at page 215 (137 N. W., at page 67, 41 L. R. A. [N. S.] 635), it is said:

"That the fire might have been set by a locomotive is undoubtedly true. But, if the testimony tends to prove no more, it is not sufficient. *Clark* v. *Railway Co.*, *supra*. It might have been set in various ways. In the language of the statute defendant is liable for damages caused by fire originating from such railroad, either from engines passing over said road, fires set by the company employees by order of the officers of the road, or otherwise, originating in the constructing or operating of the road.

"In the case at bar, as in *Osborne* v. *Railway Co.*, 111 Mich. 15 (69 N. W. 86), some of the jury seem to have been troubled concerning the proof of the origin of the fire. This inference is drawn from the question asked by one of the jurors when they returned into court for further instructions, after they had been instructed that, if they could not say from the testimony in the case that the fire was set by the defendant company, then it would be their duty to return a verdict for defendant. Unless the mere fact that fire originating upon the right of way of the railroad company, coupled with the fact that fires had sometimes been set by locomotive engines, is evidence that it was set by engines of the company, there was no evidence of

the origin of the fire of 1909. The jury should have been told that the testimony upon the subject was insufficient."

We may now approach the question of whether the plaintiff met the requirements of the law. The testimony about the passing locomotive is from a witness who was sleeping on the porch of his house about 20 rods east of the building which was burned. He testified, in substance, that while sleeping on the porch he heard a train go by. We quote:

"It was making such a noise and puffing as it went through it attracted my attention. It made a heavy noise. It was laboring hard going up the grade. I should judge by the sound it was a long train. I have heard trains go by when they are heavily loaded, and have noticed what kind of an exhaust they make.

"*Q.* How did the exhaust this train made compare with heavily loaded trains you have heard go by?

"*A.* It made an awful noise. I would say that it made about the same noise as heavily loaded trains. After it had gone by I fell asleep again. I was asleep before it went through; it woke me up, and I dropped off asleep again. The next thing occurred was first I smelled smoke. I says to my wife: 'I guess somebody is starting a fire quite early in the morning.' I could not tell whether I had been asleep a long time or a short time, but I think it was quite a little while. * * *

"*Q.* About how long do you think it was from the time the train went through until you smelled smoke?

"*A.* I should judge it was all of an hour."

On the cross-examination he testified in part:

"All I heard that night was an engine puffing and laboring going up that grade; further than that I don't know. I heard the rumbling of the train as it went through, and I guess from the noise it was a freight train. That is the only way I have of knowing, that it sounded like a freight train. Whether it was, or how many cars it had, I don't know. * * * When I was sleeping out there on the porch, this one is all

the train I heard go through. I did not think anything about it at the time; I did not say anything or speak about it; it made no impression on me; it was nothing out of the ordinary in any way.

"*Q.* It was just a customary thing that had occurred to you a number of times?

"*A.* Yes.

"*Q.* So you turned over and went to sleep?

"*A.* Yes, sir. How long I slept I do not know. The next thing I knew I smelled smoke. I had been asleep in the meantime; I couldn't pretend to say how long I slept.

"*Q.* Do you think it was something over an hour?

"*A.* About an hour; something about that.

"*Q.* But to fix the time definitely at all you wouldn't care to do that?

"*A.* No; I have no way of fixing the time when it was I first smelled smoke; it was still dark at that time."

He went to the fire and testified as to the wind at that time:

"It was just a medium breeze blowing."

No one who was sworn saw the locomotive or testified that it emitted sparks or whether it was working differently than other locomotives which made that grade. The witnesses are all agreed that, when the fire was discovered, there was none outside either in the long dry grass which was between the track and the building or upon the sides or roofs of the buildings. They are all agreed that when discovered the fire seemed to be all inside the building.

Mr. Beach, the plaintiff, was a witness. In his cross-examination occurs the following:

"*Q.* Was there any fire on the roof of the blacksmith shop that you saw?

"*A.* No.

"*Q.* Was there any fire on the roof of the two-story part that you saw?

"*A.* I think the roof was through on the two-story part when I got there.

"*Q.* The flames were practically inside when you got there?

"*A.* Yes.

"*Q.* It looked to you as though it started inside, and was burning outside?

"*A.* Yes. I did see Mr. Tiller that night. I can't say, possibly 15 minutes, possibly half an hour, after I got there. I remember talking to Mr. Tiller at the south end of the building east of the office, right in there somewhere. I did have a conversation with Mr. Tiller there at that time. That was while the fire was burning.

"*Q.* Do you remember Mr. Tiller's saying something about 'You certainly can't blame the railroad for this fire,' or asked you if you did at that time?

"*A.* He asked me if I did.

"*Q.* You remember saying that you couldn't say anything about it, but you couldn't see how the railroad could set the fire inside the building?

"*A.* No, sir; I didn't say that; I said I didn't know what to think about it.

"*Q.* Is that the fact of the matter at that time?

"*A.* Yes.

"*Q.* Is that all you said at that time?

"*A.* I don't remember saying any more. I wouldn't say whether I did, or I wouldn't answer positively I didn't say more, but I do remember saying I didn't know what I thought about it; whether I said more I wouldn't say either way. I might and might not. All down there around the mill between the mill and the railroad track there were no buildings in there, but there was grass in there, just commons with June grass on it, a foot, foot and a half high, something like that, about the condition June grass would be in in July.

"*Q.* Did you see any fire in there anywhere?

"*A.* No, sir.

"*Q.* Did you see any fire up and down the tracks anywhere?

"*A.* No, sir; not that night.

"*Q.* You didn't see any either way, up and down the track either way from the plant that night, did you?

"*A.* No.

"*Q.* On this particular night I understand you to say the windows in the engine room were open?

"*A.* No, sir.

"*Q.* Didn't you say two windows on the south side of the engine room were open this night?

"*A.* No, sir; I didn't.

"*Q.* I misunderstood, then. Where were the windows open that night?

"*A.* Not in the engine room; the windows in that shed built onto the west side. That connects with the engine room. There is a door there.

"*Q.* The windows were open this night?

"*A.* Yes; that is, upon the ground floor. There is only one story. These windows were right near the ground, oh, three or four feet from the ground, and those windows were open.

"*Q.* Nothing to prevent anybody getting in those windows at any time?

"*A.* No.

"*Q.* Or upon the night of the fire at any time?

"*A.* At any time I didn't pretend to close them shut; there was nothing in it."

We have not quoted all of the testimony, but we think one cannot read the record without reaching the conclusion, as to the origin of the fire, that Mr. Beach was quite right when he testified:

"I did not know what to think about it."

Judgment is affirmed.

STONE, C. J., and KUHN, BIRD, STEERE, BROOKE, and PERSON, JJ., concurred. OSTRANDER, J., did not sit.